**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DRK PHOTO, a sole proprietorship,
*Plaintiff-Appellant*,

v.

MCGRAW-HILL GLOBAL EDUCATION
HOLDINGS, LLC; MCGRAW-HILL
SCHOOL EDUCATION HOLDINGS,
LLC,
*Defendants-Appellees.*

No. 15-15106

D.C. No.
3:12-cv-08093-
PGR

OPINION

Appeal from the United States District Court
for the District of Arizona
Paul G. Rosenblatt, Senior District Judge, Presiding

Argued and Submitted December 14, 2016
San Francisco, California

Filed September 12, 2017

Before:  Michael Daly Hawkins, Marsha S. Berzon,
and Mary H. Murguia, Circuit Judges

Opinion by Judge Hawkins;
Concurrence by Judge Berzon

## SUMMARY[*]

### Copyright

The panel affirmed the district court's summary judgment in favor of the defendants in a copyright infringement action brought by a stock photography agency.

The panel held that the plaintiff, a nonexclusive licensing agent for the photographs at issue, failed to demonstrate any adequate ownership interest in the copyrights to confer standing. Distinguishing *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997 (9th Cir. 2015), the panel held that the plaintiff lacked standing as a legal owner because its representation agreements with the photographers did not grant the plaintiff an exclusive license to authorize use of the photographs. The panel held that under *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881 (9th Cir. 2005) (en banc), the plaintiff's assignment agreements with the photographers did not confer standing because they merely transferred the right to sue on accrued claims. The panel held that the plaintiff also lacked standing as a beneficial owner of the copyrights.

The panel affirmed the district court's denial of the plaintiff's motion to modify the scheduling order for leave to amend its complaint to join three photographers as plaintiffs.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Concurring, Judge Berzon wrote that *Silvers*, holding that the transfer of the right to sue to a nonowner or nonexclusive licensee of a copyright right can never confer standing to sue for a copyright violation, controlled but was wrongly decided.

## COUNSEL

Maurice Harmon (argued), Christopher Seidman, and Gregory Albright, Harmon & Seidman LLC, New Hope, Pennsylvania, for Plaintiff-Appellant.

Christopher P. Beall (argued) and Thomas B. Kelley, Levine Sullivan Koch & Schulz LLP, Denver, Colorado, for Defendants-Appellees.

## OPINION

HAWKINS, Circuit Judge:

This appeal raises the now often litigated issue of whether a stock photography agency—here, the Arizona-based agency DRK Photo ("DRK")—has standing under the Copyright Act of 1976 to pursue infringement claims involving photographs from its collection. Ultimately, there is no bright line answer to this question. Here, we affirm the grant of summary judgment in favor of defendants, McGraw-Hill Global Education Holdings, LLC and McGraw-Hill School Education Holdings, LLC (collectively, "McGraw-Hill"), because DRK is a nonexclusive licensing agent for the photographs at issue and has failed to demonstrate any adequate ownership interest in the copyrights to confer standing. We also affirm

the denial of DRK's motion to modify the scheduling order for leave to amend its complaint.

## BACKGROUND

DRK is a stock photography agency that markets and licenses images created by others to publishing entities, including defendants McGraw-Hill. Since its inception in 1981, DRK has built a collection of hundreds of thousands of photographs, primarily depicting worldwide wildlife, marine life, and natural history. McGraw-Hill publishes K-12 educational, post-secondary, professional, and trade textbooks and publications. From approximately 1992 to 2009, McGraw-Hill licensed photographs from DRK to use in its textbooks. Their agreements were reflected in invoices, which set forth, among other terms, the fee charged, the specific photographs licensed, and the number and form of reproductions and distributions authorized under each "[o]ne-time non-exclusive" license.

With regard to its own licensing of the photographs, DRK historically has entered into "Representation Agreements" with the photographers of the images that make up its collection. These Representation Agreements have generally taken two forms: (1) agreements appointing DRK as the "sole and exclusive agent" to license and sell the covered photographs, and (2) agreements appointing DRK as a nonexclusive agent to license and sell the covered photographs. Only the latter are at issue in this appeal.[1]

---

[1] McGraw-Hill moved for summary judgment on claims involving photographs covered by DRK's nonexclusive Representation Agreements. The parties subsequently settled all claims involving photographs covered by exclusive Representation Agreements and dismissed those claims with prejudice.

According to DRK's owner, the majority of its arrangements with photographers are nonexclusive. In relevant part, those Representation Agreements provide that DRK will act as the "agent with . . . respect to the sale or leasing of the photographs or transparencies" delivered to DRK. Many of the agreements further clarify:

> DRK PHOTO will not require, nor ask a photographer or agency for exclusivity of an image until such time that DRK PHOTO has made an exclusive sale of that image. . . . Without this condition of an exclusive license/sale being made, all parties are free to promote and/or market all images without restriction.

They also provide that DRK and the photographer will split evenly the proceeds from all sales made by DRK.

In 2008, DRK endeavored to register copyrights for the photographs in its collection. To that end, each of the photographers whose images are involved in this litigation executed identical agreements entitled "Copyright Assignment, Registration, and Accrued Causes of Action Agreement" (the "Assignment Agreements"). In relevant part, the agreements provide:

> The undersigned photographer . . . grants to DRK all copyrights and complete legal title in the Images. DRK agrees to reassign all copyrights and complete legal title back to the undersigned immediately upon completion of the registration of the Images . . . and resolution of infringement claims brought by DRK relating to the Images.

> The undersigned agrees and fully transfers all right, title and interest in any accrued or later accrued claims, causes of action, choses of action . . . or lawsuits, brought to enforce copyrights in the Images, appointing and permitting DRK to prosecute said accrued or later accrued claims, causes of action, choses in action or lawsuits, as if it were the undersigned.

The Assignment Agreements also provide that DRK and the photographers will share equally the proceeds of any litigation award or settlement.

According to DRK, "[t]he primary purpose of the assignments was to effect a transfer [of] copyright ownership to DRK that was sufficient to support its copyright enforcement efforts." In an initial transmittal email to photographers, DRK explained that with the Assignment Agreements DRK would "receive the authorization necessary to initiate and settle copyright infringement claims." In subsequent email correspondence, DRK discussed the scope and effect of the Assignment Agreement in response to questions from several photographers as to how the Agreement would affect their dealings with other agencies licensing the same or similar photographs. DRK consistently confirmed that the purpose of the Agreement was to put DRK "in a legal position to bring copyright infringement claims against infringers" and to have an agreement with the photographers as to how settlement proceeds would be divided, "nothing more." It further clarified that the copyright registration would allow DRK to bring infringement suits and that DRK had "no intentions of using it in any other manner." In another email exchange, DRK explained that there was no "'rights grab' going on

here." And in yet another exchange, DRK assured a photographer that he understood "correctly" that "the registration of copyright [would] be [the photographer's] and not [DRK's], only in case of infringement [would DRK] then use it."

Following execution of the Assignment Agreements, photographers who were parties to nonexclusive Representation Agreements with DRK continued to market and sell their photographs on their own and through other means according to the terms of the Representation Agreements. DRK admits that the photographers had no duty to account to DRK for their sales of the photographs following execution of the Assignment Agreements.

## PROCEDURAL HISTORY

In May 2012, DRK sued McGraw-Hill, asserting claims for copyright infringement premised on allegations that McGraw-Hill exceeded the scope of its licenses with DRK by printing and distributing more textbooks containing licensed images than authorized. In full, DRK alleged that McGraw-Hill made 1,120 infringing uses of approximately 636 unique photographs.

The parties eventually cross-moved for summary judgment, and the district court granted partial summary judgment to McGraw-Hill on the basis that DRK lacked standing to pursue infringement claims for photographs taken by photographers for whom DRK was acting as a nonexclusive agent.[2] In relevant part, the district court determined that the Representation Agreements covering

---

[2] The district court's judgment covered 978 of the 1,120 alleged infringements identified in the complaint.

those photographs were nonexclusive licenses such that DRK could not be deemed the legal owner of any exclusive right pertaining to the images. The district court further found that the Assignment Agreements in "substance and effect" assigned "to DRK nothing more than the 'bare right to sue.'" Finally, the district court rejected DRK's remaining contentions that it was a beneficial owner of the copyrights at issue and that recent case law had changed the landscape of our court's earlier precedent regarding the assignment of infringement claims and standing.

Following the district court's grant of partial summary judgment, and after the deadline set by the scheduling order, DRK sought leave to amend its complaint to join three photographers as plaintiffs. The district court denied the motion explaining that DRK had not shown good cause to amend the scheduling order, joinder of the photographers was not warranted under the circumstances, and DRK had not been diligent in pursuing the requested amendment. This appeal timely follows.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291. Standing in a copyright case is a question of law we review de novo. *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997, 1002 (9th Cir. 2015). We also review de novo a district court's grant of summary judgment and "determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied substantive law." *United States v. City of Tacoma*, 332 F.3d 574, 578 (9th Cir. 2003). We review a district court's denial of a motion to modify a scheduling order for abuse of discretion. *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1174 n.6 (9th Cir. 2007).

## DISCUSSION

Section 501(b) of the Copyright Act of 1976 establishes who has standing to sue for infringement: "The legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the [registration] requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it."  17 U.S.C. § 501(b).[3]  Section 106 sets forth an exhaustive list of those exclusive rights. *Id.* § 106; *Silvers v. Sony Pictures Entm't., Inc.*, 402 F.3d 881, 887 (9th Cir. 2005) (en banc).  "They are the rights 'to do and to authorize' others to do six things with the copyrighted work:  to reproduce the work, to prepare derivative works based upon the work, to distribute copies of the work, to perform the work publicly, to display the work publicly, and to record and perform the work by means of an audio transmission." *Minden*, 795 F.3d at 1002 (quoting 17 U.S.C. § 106).

---

[3] Contrary to DRK's contention, *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014), does not expand the class of plaintiffs with standing to sue for copyright infringement.  When evaluating whether a plaintiff had standing under the Lanham Act, *Lexmark* explained that, despite a statute's expansive wording, courts "presume that a statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Id.* at 1388 (internal quotation marks omitted).  Thus, the "zone of interests" test applies as a logical limitation on "who may invoke" a statutory cause of action that otherwise appears unfettered. *Id.* at 1388–89.  It is not, as DRK suggests, a tool for expanding and overriding a clear statutory limitation on standing.  The Copyright Act expressly limits standing to two types of plaintiffs:  (1) legal owners, and (2) beneficial owners.  17 U.S.C. § 501(b). *Lexmark* does not alter that express limitation.

Here, DRK contends that it has standing as either a legal owner or as a beneficial owner of the copyrights. We evaluate each argument in turn.

## I.  Legal Ownership.

"Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred . . . and owned separately." 17 U.S.C. § 201(d)(2). "[E]ither an *assignment* (which transfers legal title to the transferee) or an *exclusive license* (which transfers an exclusive permission to use to the transferee) qualifies as a 'transfer' of a right in a copyright for the purposes of the Act." *Minden*, 795 F.3d at 1003; *accord* 17 U.S.C. § 101. By contrast, a mere "nonexclusive license" does not constitute a "transfer of copyright ownership" and therefore cannot confer standing to assert an infringement claim. *See* 17 U.S.C. § 101.

To support its claim of legal ownership, DRK points to (1) the Representation Agreements, which grant DRK a license to authorize use of the photographs; and (2) the Assignment Agreements, which purport to transfer to DRK the legal title to and copyrights of the photographs along with accrued infringement claims.

### A.  *The Representation Agreements.*

We recently held in *Minden Pictures, Inc. v. John Wiley & Sons, Inc.* that a stock photography agency that served as the exclusive licensing agent for allegedly infringed photographs had standing to sue for infringement under the Copyright Act. 795 F.3d at 1004–05. DRK contends that *Minden* creates a bright line rule that stock photography agencies have standing to bring copyright infringement claims by virtue of their agency agreements with their

contributing photographers.  However, DRK reads *Minden* too broadly.

*Minden* indeed analyzed whether a stock photography agency, Minden Pictures, Inc. ("Minden"), had standing to sue a publisher for infringement after the publisher exceeded the scope of its licensing agreement with Minden.  *Id.* at 1001.  Like DRK, Minden also entered into agency agreements with its contributing photographers under which the photographers authorized Minden to license and sell certain photographs to third parties.  *Id.* at 999–1000.  Importantly, in those licensing agreements, the photographers agreed to appoint Minden "as sole and exclusive agent and representative with respect to the Licensing of any and all uses of [specified photographs]."  *Id.* at 1000.  Although the agreements "permit[ted] the photographers to issue some licenses themselves," the photographers were "prohibit[ed] . . . from hiring a licensing agent other than Minden."  *Id.*  The publisher argued that Minden's agreements with the photographers did not "grant 'exclusive licenses' to Minden to grant licenses to third parties, because the photographers retain[ed] the right to issue licenses themselves."  *Id.* at 1004.

*Minden* rejected that argument, and held that the agreements at issue granted exclusive licenses of the right to authorize, rendering Minden a "legal owner" with standing to sue.  Relying on "the divisibility principle embodied by the 1976 [Copyright] Act," *Minden* explained that the fact that the photographers retained some ability to authorize use did not render Minden's license nonexclusive:

> [W]e agree with the Seventh Circuit that the essence of an "exclusive" license under the Act is that "the copyright holder permits the licensee to use the protected material for a

specific use and further promises that the same permission will not be given to others." *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996). Minden has been given just such a promise. Under the Agency Agreements, Minden is the "sole and exclusive agent and representative with respect to the Licensing of any and all uses" of the photographs. That is, the photographers have promised that Minden, and only Minden, will have the power, as the photographers' licensing agent, to authorize third parties to reproduce, distribute, and display the photographs. That the photographers have retained some limited degree of authority to grant licenses themselves does not eliminate Minden's interest in the copyright as the sole entity to act as the photographers' licensing agent. It merely means that *both* Minden and the photographers, under the terms of the Agreements, can prevent those third parties who have not received permission to use the photographs from using them.

*Id.* at 1004–05. As *Minden* explained, this concept of exclusivity as the right to exclude third parties, even when another entity can also exclude third parties, is consistent with patent law treatment of similar arrangements. *Id.*

In so holding, *Minden* declined to apply a rigid test to determine exclusivity and adopted a more flexible approach that allows for a license to be exclusive even if the copyright owner retains some subset of the rights at issue. *See id.* The key to determining whether Minden's agency agreements conferred a nonexclusive or exclusive license thus was not

whether the photographers retained some fractional right but instead that the photographers promised "that Minden, *and only Minden*, will have the power, as the photographers' licensing agent, to authorize third parties to reproduce, distribute, and display the photographs." *See id.* at 1005 (emphasis added).

DRK's Representation Agreements here at issue, on the other hand, are devoid of that key provision. They also lack any limitation whatsoever on the photographers' authority to contract with other licensing agents.[4] In the absence of any such promise, DRK's Representation Agreements confer nonexclusive licenses and do not render DRK a legal owner for standing purposes. *Cf. Bourne Co. v. Hunter Country Club, Inc.*, 990 F.2d 934, 937 (7th Cir. 1993) (nonexclusive licensing agent not a necessary party because it was neither a legal nor a beneficial owner of the copyright).

DRK suggests that it nevertheless possesses an ownership interest merely because the Representation Agreements pertain to the right "to authorize" as opposed to one of the exclusive rights listed in section 106. Neither the statutory text nor the analysis in *Minden* suggests that, having been given the right "to authorize" others to exercise the rights of copyright holders, a nonexclusive licensee becomes a legal owner with standing to sue. *Cf. Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1093 (9th Cir. 1994) (en banc) ("[W]e believe that '"to authorize" [wa]s simply a convenient peg on which Congress chose to

---

[4] We therefore need not consider whether a licensing agency arrangement that limits the number of other licensing agents that will be permitted is an exclusive licensing arrangement sufficient to permit enforcement actions. *See id.* at 1004 (discussing authorities suggesting that an exclusive licensee need not be a sole licensee).

hang the antecedent jurisprudence of third party liability.'" (quoting 3 David Nimmer & Melville B. Nimmer, *Nimmer on Copyright* § 12.04[A][3][a], at 12–84 n.81 (1993))).

B.  *The Assignment Agreements.*

DRK next contends that, even if it was not a legal owner originally by virtue of the Representation Agreements, it became the legal owner when the Assignment Agreements passed full legal title of each photograph and copyright along with all accrued claims to DRK.  McGraw-Hill counters that the Assignment Agreements are nothing more than invalid attempts to transfer the bare right to sue.

In *Silvers v. Sony Pictures Entertainment*, 402 F.3d 881 (9th Cir. 2005) (en banc), we held that "an assignee who holds an accrued claim for copyright infringement, but who has no legal or beneficial interest in the copyright itself, [may not] institute an action for infringement."  *Id.* at 883. This conclusion naturally followed from the notable absence of the "right to sue" from the list of exclusive rights set forth in section 106 and was reinforced by the text and legislative history of the Copyright Act as a whole.  *Id.* at 885–90.[5]

Later, we clarified that the purported transfer of legal title coupled with the transfer of accrued claims does not confer standing when the transaction, in substance and

---

[5] *Silvers* suggested that a subsequent legal owner may have standing to pursue accrued causes of action where the causes of action were transferred along with full ownership of the copyright.  402 F.3d at 890 n.1.  *Silvers* noted that the holding of a Second Circuit case to that end "makes perfect sense, as it is consistent with the Act and with the constitutional purpose of encouraging authors and inventors by creating a limited monopoly on their works and inventions."  *Id.* (citing *ABKCO Music, Inc. v. Harrisongs Music Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991)).

effect, merely transfers a bare right to sue. *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1169–70 (9th Cir. 2013). There, the plaintiff Righthaven LLC "was founded, according to its charter, to identify copyright infringements on behalf of third parties, receive 'limited, revocable assignment[s]' of those copyrights, and then sue the infringers." *Id.* at 1168. Righthaven asserted copyright infringement claims against two defendants for their allegedly unauthorized online posting of articles from the *Las Vegas Review-Journal*. *Id.* Righthaven was not the owner of the copyrights of those articles at the time of the alleged infringement. *Id.* Instead, the copyrights were owned by Stephens Media LLC, the company that owns the *Las Vegas Review-Journal*. *Id.* After the alleged infringement, Stephens Media and Righthaven executed a copyright assignment agreement for each article. *Id.* Those assignments provided that, "subject to [Stephens Media's] rights of reversion, Stephens Media granted to Righthaven all copyrights requisite to have Righthaven recognized as the copyright owner of the Work for purposes of Righthaven being able to claim ownership as well as the right to seek redress for past, present, and future infringements of the copyright . . . in and to the Work." *Id.* (internal quotation marks omitted).

Prior to executing the assignments, Righthaven and Stephens Media executed a Strategic Alliance Agreement ("SAA"), which clarified that following an assignment of copyright Stephens Media would retain "an exclusive license to exploit the copyrights for any lawful purpose whatsoever" and upon thirty days prior notice could "revert the ownership of any assigned copyright back to itself." *Id.* at 1169 (internal quotation marks omitted). The SAA further provided that Righthaven had no right to exploit the copyrights or participate in any royalties. *Id.* at 1168–69.

Both defendants moved to dismiss for lack of standing. *Id.* at 1169. Righthaven and Stephens Media then executed a "Clarification and Amendment to Strategic Alliance Agreement" in which they "purported to clarify that the parties' intent in entering the SAA was to 'convey all ownership rights in and to any identified Work to Righthaven through a Copyright Assignment so that Righthaven would be the rightful owner of the identified Work.'" *Id.* *Righthaven* held that, despite their language purporting to transfer title and ownership, the copyright assignments in their substance and effect did no more than transfer a right to sue. *Id.* at 1172. Looking to the combined effect of the assignment and the SAA, *Righthaven* recognized that Stephens Media retained all exclusive rights to the articles and Righthaven had little if any right to exploit the works absent Stephens Media's consent. *Id.* at 1170–72. Thus, for all practical purposes, the assignments did nothing more than transfer a right to sue. *Id.*

Here, the parties similarly dispute whether the Assignment Agreements actually transferred ownership of the copyrights along with the accrued claims. As a preliminary matter, we reject DRK's contention that McGraw-Hill is precluded from challenging the effect of the Assignment Agreements. Although a third party may not raise noncompliance with 17 U.S.C. § 204(a)'s writing requirement as a defense to a copyright transfer where the parties to the transfer do not dispute its existence, *Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146, 1157 (9th Cir. 2010), a third party is not foreclosed from challenging a plaintiff's ownership for purposes of standing, *see Righthaven*, 716 F.3d at 1169. Indeed, it is the plaintiff who has the burden of establishing a qualifying ownership interest both as a substantive element of the infringement claim, *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*,

499 U.S. 340, 361 (1991), and as a necessary predicate for standing to bring the claim, 17 U.S.C. § 501(b). *See Urbont v. Sony Music Entm't*, 831 F.3d 80, 88 (2d Cir. 2016) ("[E]ven courts that have precluded third parties from challenging a plaintiff's ownership rights under the statute of frauds provision in Section 204 have permitted those parties to challenge the validity of the underlying ownership transfer.").

*Righthaven* instructs that the assignment agreements' use of "language purporting to transfer ownership . . . is not conclusive . . . [and] [w]e must consider the substance of the transaction." 716 F.3d at 1170. Thus, as in *Righthaven*, we must consider the Assignment Agreements in conjunction with the Representation Agreements and the ongoing relationship between DRK and the individual photographers. The alleged acts of infringement occurred prior to the execution of the Assignment Agreements. DRK concedes that following the execution of the Assignment Agreements, photographers who were parties to nonexclusive Representation Agreements could continue to market and sell the covered photographs themselves and through other means under the terms of the Representation Agreements. The photographers did not pay royalties or fees of any kind to DRK following execution of the Assignment Agreements. DRK's admitted course of dealing with photographers following the execution of the Assignment Agreements demonstrates that each party retained the rights it had under the nonexclusive Representation Agreements—meaning the photographers retained the exclusive rights to the photographs and DRK retained a nonexclusive license to authorize their use. As the district court recognized, the

email exchanges surrounding execution of the Assignment Agreements further underscore this reality.[6]

DRK argues it was error to interpret the substance and effect of the Assignment Agreements contrary to DRK and the photographers' intent that DRK obtain the ownership interest necessary to register and pursue infringement claims on the copyrights at issue.[7] DRK relies upon declarations submitted in opposition to McGraw-Hill's motion for summary judgment, which, like the clarification agreement in *Righthaven*, stated that the photographers "intended to transfer the copyrights to all . . . photographs" with the "intent that DRK should retain an ownership interest in the images until the full resolution of any infringement claims relating to those images" and so that DRK could "protect, by lawsuits if necessary, against unpermitted uses." As in *Righthaven*, however, "[t]he problem is not that the district court did not read the contract in accordance with the parties'

---

[6] DRK argues for the first time on appeal that evidence of its email correspondence with individual photographers submitted by McGraw-Hill in support of summary judgment is inadmissible under the parol evidence rule. DRK failed to raise any objection to the admissibility of this evidence before the district court. Under the circumstances, DRK's failure to raise any objection or argument on this issue before the district court precludes it from doing so on appeal. *See Getz v. Boeing Co.*, 654 F.3d 852, 868 (9th Cir. 2011).

[7] The validity of the registration of the copyrights or the effectiveness of the assignment for purposes of registration is not at issue in this case. A temporary transfer of ownership for the purpose of registering a collection is valid for purposes of that registration. *Alaska Stock, LLC v. Houghton Mifflin Harcourt Publ'g Co.*, 747 F.3d 673, 676–77, 685 (9th Cir. 2014). Although a certificate of registration may serve as "prima facie evidence of the validity of the copyright and of the facts stated in the certificate," the registrations here are entitled to no such presumption because they were filed more than five years after the first publication of the work. 17 U.S.C. § 410(c).

intent; the problem is that what the parties intended was invalid under the Copyright Act." 716 F.3d at 1171. The undisputed evidence shows that for all practical purposes, the nonexclusive Representation Agreements continued to govern who controlled the exclusive rights associated with the photographs following execution of the purported copyright assignments; thus, the substance and effect of the Assignment Agreements was merely a transfer of the right to sue on accrued claims, which cannot confer standing. *See Silvers*, 402 F.3d at 890.

Finally, we reject DRK's contention that *Silvers* has been implicitly overruled by *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269 (2008). A three-judge panel is bound by prior circuit authority unless the authority is "clearly irreconcilable" with intervening Supreme Court precedent. *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc). *Sprint* held that assignees of payphone operators' accrued claims under the Communications Act had Article III standing to bring the collection suit at issue. 554 U.S. at 271, 275. *Sprint* did not involve the Copyright Act, and its standing analysis was not predicated on any statutory provision analogous to section 501(b). Consequently, *Sprint* does not undercut the reasoning of *Silvers*, which was grounded on the specific statutory language and history of the Copyright Act's standing provision for infringement claims, and *Sprint* and *Silvers* are not "clearly irreconcilable." *See Miller* 335 F.3d at 893. To be sure, *Righthaven*, which post-dates *Sprint*, also applied the rule of *Silvers*, and a three-judge panel of this court is bound by both *Silvers* and *Righthaven*.

Although we are certainly sympathetic to the practical challenges attendant to policing infringement of photographic art in the publishing industry, those practical

considerations cannot override the Copyright Act's "carefully circumscribed" grant of the right to sue. *Silvers*, 402 F.3d at 885. The nonexclusive licenses and assignments of the bare right to sue present here do not render DRK a legal owner of the copyrights under controlling law and thus are insufficient to confer standing.

## II. Beneficial Ownership.

In the alternative, DRK contends that it is the beneficial owner of the copyrights for the photographs at issue.

Although section 501(b) provides that a beneficial owner of a copyright is entitled to bring an infringement action, the Copyright Act does not define the term "beneficial owner." The classic example of a beneficial owner is "an author who ha[s] parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1144 (9th Cir. 2003) (quoting H.R. Rep. No. 1476, at 159); *accord Broad. Music, Inc. v. Hirsch*, 104 F.3d 1163, 1166 (9th Cir. 1997) ("Beneficial ownership arises by virtue of section 501(b) for the purpose of enabling an author or composer to protect his economic interest in a copyright that has been transferred."). By contrast, an author who receives royalties for a work created under a work-for-hire agreement, and thus who never had ownership of the work, is not a beneficial owner. *Warren*, 328 F.3d at 1144–45.

We have not previously explored the full extent of who may qualify as a beneficial owner of copyright, and we need not do so here. Indeed, to support its arguments that it is a beneficial owner, DRK once again points solely to the Representation Agreements and the Assignment Agreements. Yet, under those agreements, DRK is a nonexclusive licensing agent and an assignee of accrued

causes of action. To hold that DRK is a beneficial owner simply on the very bases that it cannot be deemed the legal owner would effectively negate our holding in *Silvers* and render portions of section 501(b) superfluous. Thus, on the specific facts of this case, DRK has failed to demonstrate that it is a beneficial owner. *See Bourne*, 990 F.2d at 937 (recognizing that a nonexclusive licensing agent is not a beneficial owner).

## III.    DRK's Motion to Amend.

Finally, DRK contends that the denial of its motion to amend was erroneous. Where, as here, a party seeks leave to amend after the deadline set in the scheduling order has passed, the party's request is judged under Federal Rule of Civil Procedure ("FRCP") 16's "good cause" standard rather than the "liberal amendment policy" of FRCP 15(a). *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 737 (9th Cir. 2013). The central inquiry under Fed. R. Civ. P. 16(b)(4) is whether the requesting party was diligent in seeking the amendment. *Id.*

The district court did not abuse its discretion in determining that DRK was not diligent in seeking leave to amend. As the district court highlighted, McGraw-Hill raised standing as an affirmative defense in its answer less than one month after the litigation was initiated and nearly two years before DRK finally sought leave to amend. McGraw-Hill again raised its standing argument in the parties' Joint Case Management Report prior to the entry of the scheduling order. And, DRK's claims were dismissed in a parallel litigation on the very standing theory that McGraw-Hill raised in this case. Yet, DRK waited until after the adverse grant of summary judgment to seek leave to amend. Given these facts, the district court's findings that DRK had ample notice of the defense and failed to exercise

diligence are not clearly erroneous, and the district court's denial of leave to amend was not an abuse of discretion. *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992) (explaining that if party seeking amendment "was not diligent, the inquiry should end").[8]

## CONCLUSION

Ultimately, DRK failed to demonstrate or otherwise create a genuine dispute of material fact whether it is a legal or beneficial owner of any exclusive right under the copyrights at issue. Accordingly, DRK failed to meet the standing requirements of section 501(b), and summary judgment in favor of the defendants was warranted. Further, the district court's determination that DRK failed to exercise reasonable diligence in seeking leave to amend its complaint was not erroneous, and thus, it was not an abuse of discretion to deny DRK's motion for leave to amend.

**AFFIRMED.**

---

[8] Nor did the district court err by denying DRK's request to join the three photographers under FRCP 17(a). *See Commonwealth of Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co., Inc.*, 814 F.3d 641, 643 (2d Cir. 2016) (affirming denial of FRCP 17 motion as untimely where the plaintiff waited until after the court granted summary judgment to defendants on standing grounds to seek joinder of additional plaintiffs even though the standing issue was raised in the defendants' pleadings more than one year earlier).

BERZON, Circuit Judge, concurring:

As the main opinion explains, under *Silvers v. Sony Pictures Entertainment, Inc.*, 402 F.3d 881 (9th Cir. 2005), the transfer of the right to sue to a nonowner or nonexclusive licensee of a copyright right can never confer standing to sue for a copyright violation, no matter the relationship of the transferee to the copyrighted material. Main Op. at 14–15. I write separately to reiterate my view that *Silvers* was wrongly decided. In *Silvers*, I would have concluded that Nancey Silvers, the creator of the copyrighted work, had an interest in infringement sufficient to confer standing. By the same logic, I would conclude that DRK photo has an interest in infringement sufficient to confer standing to pursue the causes of action here at issue. Because *Silvers* remains controlling, however, I am compelled to agree with the majority's determination that DRK Photo lacks standing.

Section 501(b) provides that "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b). That provision, in my view, should not be read to exclude categorically *any* party not the "legal or beneficial owner" from bringing an infringement claim, even if the legal or beneficial owner authorizes that party to sue and even if that party has an independent interest in enforcing the copyright other than assignment of the right to sue.

The *Silvers* majority impliedly recognized that the limitation on an owner of a copyright bringing suit "while he or she is the owner of it" should be read pragmatically. It acknowledged that a copyright owner may pursue claims accrued before he or she acquired the copyright. Permitting the new owner to sue for accrued claims "makes . . . sense"

because "[w]hen one acquires a copyright that has been infringed, one is acquiring a copyright whose value has been impaired," and "[c]onsequently, to receive maximum value for the impaired copyright, one must also convey the right to recover the value of the impairment by instituting a copyright action." *Silvers*, 402 F.3d at 890 n.1. A construction of § 501(b) that allows an accrued cause of action to transfer when copyright ownership transfers cannot be reconciled with a construction that always precludes assignment of the right to sue to any party not the legal or beneficial owner.

As my dissent in *Silvers* explained, I believe the question whether copyright claims are assignable should be similarly informed by the overall purpose of the Copyright Act. *Id.* at 893 (Berzon, J., dissenting). The issue in *Silvers* was whether an author of a script could bring an action for infringement when the work was created as a work-for-hire such that the author did not own the copyright. Disagreeing both with the majority's conclusion that only the present legal or beneficial copyright owner has standing to bring a claim, and with Judge Bea's assertion in a separate dissent that there ought to be "an entirely free market for accrued causes of action in copyright," *id.* at 891 (Berzon, J., dissenting) (citing *id.* at 905 (Bea, J., dissenting)), I proposed that we chart a middle course. As I wrote, "I would hold that Silvers, given her status as the original creator of the contested 'work-for-hire,' may pursue the accrued claims assigned by Frank & Bob Films, while a complete stranger . . . could not." *Id.*

In other contexts, this circuit looks to "the general goal of the statute" in deciding whether to recognize assignment of claims created by federal statute. *Misic v. Bldg. Serv. Emps. Health & Welfare Trust*, 789 F.2d 1374, 1377 (9th

Cir. 1986) (per curiam). For example, in the ERISA context, we permit a health care provider, assigned accrued causes of action for health welfare benefits by patients, to pursue reimbursement claims, notwithstanding a statutory provision identifying only "participants, beneficiaries, fiduciaries, and the Secretary of Labor" as having standing. *Id.* at 1378 (citing 29 U.S.C. § 1132(a)); *see Silvers*, 402 F.3d at 892–93 (Berzon, J., dissenting). Derivative standing for the health care providers, we determined, was "consistent with Congressional intent." *Simon v. Value Behavioral Health, Inc.*, 208 F.3d 1073, 1081 (9th Cir. 2000). We do not, however, allow "health care providers to whom the beneficiaries originally assigned their claims" to reassign claims; doing so would "allow third parties with no relationship to the beneficiary to acquire claims solely for the purpose of litigating them" and be "tantamount to transforming health benefit claims into a freely tradable commodity." *Id.*

Applying that logic to the assignability of a copyright claim in *Silvers*, I maintained that "the relevant inquiry is whether recognition of the assignment to Silvers is consistent with Congress' overall intent in enacting the 1976 Copyright Act." 402 F.3d at 893 (Berzon, J., dissenting). Based on the fact that Silvers had "a significant interest" in "how her work was used," I would have concluded that assignment was, in that case, consistent with the congressional purpose. *Id.* at 893–94.

In my view, DRK Photo, as the agency authorized to license photographs on behalf of the photographers, has a significant interest in the way the photographs it licenses are used that should be sufficient to confer standing. That interest arises not merely from the photographers' grant of the right to sue, but from DRK Photo's position as the

licensing agent. The licenses in question were issued to McGraw-Hill by DRK, not by the individual photographers. And DRK negotiated with McGraw-Hill to determine the parameters of the permitted use, including the number of copies, geographic distribution area, language, and electronic use. Further, DRK received a portion of the royalties paid by McGraw-Hill.

In contrast to patent law, the primary purpose of which is to encourage invention and innovation, the goal of the copyright system is to encourage the publication and dissemination of copyrighted works: "For the author seeking copyright protection, . . . disclosure is the desired objective." *Eldred v. Ashcroft*, 537 U.S. 186, 216 (2003). By serving as a licensing agent, DRK Photo promoted that objective of disclosure and so was not "a complete stranger," *Silvers*, 402 F.3d at 891 (Berzon, J., dissenting), to the process of "creation and publication of free expression," *Eldred*, 537 U.S. at 219.

Under the pragmatic approach to the assignability of infringement claims that I continue to favor, I would find that DRK Photo could validly bring suit against McGraw-Hill. That approach would "remove what would otherwise be a significant practical disadvantage in seeking to protect a copyrighted work": Given "the expenses of litigation" and "the burdens of coordination," photographers may be reluctant "to bring suit individually, either in individual actions or in a single suit under Federal Rule of Civil Procedure 20." *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997, 1005 (9th Cir. 2015).

For now, however, *Silvers*' prohibition on assignment of claims to any party other than the "legal or beneficial owner" controls. Because I concur with the main opinion's determination that DRK Photo is not the legal or beneficial

owner, I must conclude that DRK Photo lacks standing to bring these claims.